**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| ALFRED RICKY BISHOP, : | |
| : | Civil Action No. 16-9178(RMB) |
| Petitioner : | |
| : | |
| v. : | **OPINION** |
| : | |
| THE STATE OF NEW JERSEY, : | |
| *et al.*, : | |
| : | |
| Respondents : | |
| : | |

**BUMB**, District Judge

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Pet., ECF No. 1) filed by Petitioner Alfred Ricky Bishop ("Petitioner"), an inmate confined in Northern State Prison in Newark, New Jersey. Respondents filed an answer opposing habeas relief. (Answer, ECF No. 5.) For the reasons discussed below, the Court denies the petition.

I.   PROCEDURAL HISTORY

On September 7, 2004, Petitioner was indicted in state court in Atlantic County, New Jersey for possession of a controlled dangerous substance (cocaine) in violation of N.J.S. § 2C:35-10a(1) (Count One); possession of a controlled dangerous substance with intent to distribute in violation of N.J.S. §§ 2C:35-5a(1)

and 2C35-5b(3) (Count Two); and possession with intent to distribute a controlled dangerous substance on public property, in violation of N.J.S. § 2C:35-7.1 (Count Three). (Answer, Ex. 9, ECF No. 5-11.) Petitioner pled guilty to Count One on February 22, 2005. (Answer, Exs. 1, 10, ECF Nos. 5-3, 5-12.)

On June 29, 2005, Petitioner waived indictment and pled guilty to the charges in Atlantic County Accusation No. 05-06-1364 including, aggravated manslaughter in violation of N.J.S. § 2C:11-4a (Count One); terroristic threats in violation of N.J.S. § 2C:12-3a; and unlawful possession of a weapon in violation of N.J.S. § 2C:39-5b (Count Three). (Answer, Exs. 2, 11, ECF Nos. 5-4, 5-13.) Petitioner attempted to withdraw his guilty plea in hopes of a lighter sentence but the trial court denied his motion. (Answer, Ex. 3, ECF No. 5-5 at 3T8-13.)

On August 25, 2005, Petitioner was sentenced in accordance with his plea agreements to a three-year term of imprisonment on Count One of Indictment No. 04-09-1827; a 24-year term of imprisonment with an 85% parole disqualifier and five-year term of parole supervision on Count One of Accusation No. 05-06-1364, to be served consecutively with Count One of the Indictment; four-year terms of imprisonment on Counts Two and Three of Accusation No. 05-06-1364, to be served concurrently with Count One of the Accusation, and consecutive to Count One of the Indictment. (Answer, Ex. 3, ECF No. 5-5 at 3T:35-37.) The remaining counts in

2

Indictment No. 04-09-1827 were dismissed. (Answer, Ex. 3, ECF No. 5-5 at 3T37.)

On June 4, 2007, the Appellate Division affirmed Petitioner's sentence. (Answer, Ex. 15, ECF No. 5-17.) Petitioner timely filed a petition for certification to the New Jersey Supreme Court, which denied the petition on February 21, 2008. (Id., Ex. 17, ECF No. 5-19.) Petitioner filed a motion for post-conviction relief ("PCR") on April 4, 2008. (Id., Ex. 18, ECF No. 5-20.) The PCR Court held a hearing and denied the petition on March 31, 2009. (Id., Exs. 5, 19, ECF Nos. 5-7, 5-21.) Petitioner appealed, and on January 3, 2011, the Appellate Division affirmed in part and remanded in part for an evidentiary hearing. (Id., Exs. 20, 21, ECF Nos. 5-22, 5-23.) Petitioner filed a petition for certification with the New Jersey Supreme Court, appealing the Appellate Division's January 3, 2011 decision. (Id., Ex. 22, ECF No. 5-24.) The New Jersey Supreme Court denied the petition on June 16, 2011. (Id., Ex. 23, ECF No. 5-25.)

After holding a hearing on PCR remand, the PCR court denied the petition on January 6, 2014. (Id., Ex. 24, ECF No. 5-26.) Petitioner appealed, and the Appellate Division affirmed the PCR remand court decision on June 22, 2016. (Id., Exs. 25, 26, ECF Nos. 5-27, 5-28.) Petitioner filed a petition for certification to the New Jersey Supreme Court, and the New Jersey Supreme Court denied the petition on November 9, 2016. (Id., Exs. 27, 28, ECF

Nos. 5-29, 5-30.) Petitioner filed the instant habeas petition on December 12, 2016. (Pet., ECF No. 1.)

II.  BACKGROUND

In a plea hearing on Indictment No. 04-09-1827, held on February 22, 2005, Petitioner admitted he was in possession of cocaine at the Berkley Gardens Apartments in Atlantic City, New Jersey on August 5, 2004. (Answer, Ex. 1, ECF No. 1-3 at 1T6:17-7:5.) Pursuant to a plea agreement, Petitioner pled guilty to this offense in return for dismissal of the remaining charges and the State's recommendation of a long-term inpatient drug treatment or a three-year term of imprisonment. (Id., 1T3:1-13.)

On June 29, 2005, Petitioner waived indictment on Accusation No. 05-06-1364 in Atlantic County and pled guilty to three counts. (Answer, Ex. 2, ECF No. 5-4 at 2T2.)  The state court record reveals the following details of the crimes to which Petitioner pled guilty. Around 2:00 or 2:30 in the afternoon of March 29, 2005, in Atlantic City, New Jersey, Petitioner saw Shaquanna Smith walking with her thirteen-year-old sister and called out to the thirteen-year-old girl. (Answer, Ex. 2, ECF No. 5-4 at 2T17:23-19:2; Ex. 5, ECF No. 5-7 at 5T16:18-17:9.) Smith told Petitioner the girl did not want to talk to him and Petitioner began following them. (Id.) Petitioner brandished a gun and yelled that he could speak to whomever he wished, threatening to shoot Smith if she

4

interfered. (Id.) The girls continued walking and Petitioner eventually walked away from them. (Id.)

At approximately 10:00 p.m. that same evening in Atlantic City, Petitioner approached K.O. and her friends, pulled out his gun, and ordered the girls to get on the ground. (Answer, Ex. 2, ECF No. 5-4 at 2T17-18; Ex. 5, ECF No. 5-7 at 5T17:10-14; Ex. 21, ECF No. 5-23 at 3.) Petitioner fired his gun into the air and rode away on his bicycle. (Id.)

That night, Petitioner was at his girlfriend's home in Atlantic City, and Eliza Hernandez, whom Petitioner knew, was also there. (Id., Ex. 2, ECF No. 5-4 at 2T14:9-17:18; Ex. 5, ECF No. 5-7 at 5T17:17-18:10.) Petitioner, standing directly in front of Hernandez, pointed a loaded revolver in her face. (Id.) Cocking and uncocking the hammer of the gun, Petitioner shot Hernandez in the eye, killing her. (Id.)

Prior to sentencing, Petitioner attempted to withdraw his guilty plea to aggravated manslaughter, arguing the recommended sentence was excessive for what he called an accident. (Id., Ex. 3, ECF No. 5-5 at 3T8:12-17.) The court denied the motion and sentenced Petitioner according to the terms of the plea agreements. (Id. at 3T12:8-10; 3T32:7-37:5.) In support of the sentence, the court found that aggravating factors for risk of reoffending (factor three), Petitioner's criminal history (factor six), and need for deterrence (factor nine) substantially outweighed the

absence of mitigating factors. (Answer, Ex. 3, ECF No. 5-5 at 3T33:12-34:24.)

Petitioner appealed the sentence, arguing that the court improperly used his mental health history to support findings of aggravating factors three and nine. (Id., Ex. 4, ECF No. 5-6 at 4T25:11-26:8.) The Appellate Division rejected the argument and affirmed Petitioner's sentences. (Answer, Ex. 15, ECF No. 5-17.)

Petitioner raised various claims of ineffective assistance of counsel in his PCR petition, including that his counsel was ineffective for failing to file a motion to suppress a statement Petitioner made to police upon his arrest. (Id., Ex. 5, ECF No. 5-7 at 5T5:3-4, 5T7:2-7.) Petitioner also claimed his attorney was ineffective for failing to hire a mental health expert to determine if Petitioner had a mental health defense. (Id. at 5T31:8-11.) The PCR court denied the petition, and the Appellate Division affirmed with the exception of the claim asserting counsel should have hired a mental health expert, which the Appellate Division remanded for an evidentiary hearing. (Id., Ex. 21, ECF No. 5-23 at 9-10.)

At the PCR remand hearing, Petitioner testified that he was in a trance when he shot Eliza Hernandez, and he heard voices telling him to play with the gun. (Id., Ex. 6, ECF No. 5-8 at 6T23:16 – 25:6.) After the shooting, he left the house and emerged from the trance, realizing he had done something wrong. (Id.) He went to his brother's house in Somers Point, then went to

Washington D.C., where his aunt lived. (Answer, Ex. 6, ECF No. 5-8 at 6T23:16-25:6.)

Psychologist David Bogacki testified on Petitioner's behalf. (Id., Ex. 7, ECF No. 5-9 at 7T20:1-6.) Dr. Bogacki evaluated Petitioner after the Appellate Division remanded for a PCR evidentiary hearing, and he diagnosed Petitioner with polysubstance abuse in full sustained remission, generalized anxiety disorder, rule out bipolar disorder, history of psychotic symptoms, and personality disorder NOS, with histrionic and antisocial traits. (Id., Ex. 29, ECF No. 5-31 at 7.) He concluded that Petitioner was likely suffering from a mental health disorder at the time of the shooting. (Id., Ex. 7, ECF No. 5-9 at 7T29:10-30:1-10.)

On cross examination, Dr. Bogacki testified that Petitioner never told him he heard voices telling him to shoot Hernandez. (Id. at 7T41:11-17.) Dr. Bogacki also testified that during his evaluation of Petitioner, Petitioner said he was extremely reckless at the time of the shooting, and the shooting occurred as a result of his recklessness. (Id. at 7T42:14-20.) Dr. Bogacki agreed that Petitioner's conduct and statements following the shooting indicated his awareness of wrongdoing. (Id. at 7T42.)

Petitioner's trial counsel, Joel Mayer, testified on behalf of the State at the PCR remand hearing. (Answer, Ex. 6, ECF No. 5-8 at 6T54-6T64.) Mr. Mayer was aware of Petitioner's mental health

history prior to Petitioner's plea and he discussed it with the prosecutor during plea negotiations. (Answer, Ex. 6, ECF No. 5-8 at 6T64:8-23.) Mr. Mayer had represented clients in cases where diminished capacity or insanity defenses were at issue, but he decided against having Petitioner evaluated by a mental health expert because he did not think a mental health defense was viable in light of the evidence against Petitioner. (Id.) Petitioner was facing the possibility of being charged with murder, which would have subjected him to a much greater sentence if he went to trial and was convicted. (Answer, Ex. 6, ECF No. 5-8 at 6T55:6-57:7.)

The PCR remand court rejected Petitioner's claim due to lack of corroboration and lack of credibility. (Id., Ex. 8, ECF No. 5-10 at 8T19:20-20:3.) There was a lack of corroboration because Petitioner was not diagnosed with an illness that established he did not know the nature and quality of his action, did not know the action was wrong or that he was incapable of acting with the requisite state of mind. (Id. at 8T18:3-12.) Petitioner was not credible because the PCR remand was the first time he mentioned that he heard voices and was in a trance at the time of the shooting. (Id. at 8T20:16-23:17.) Therefore, the PCR remand court concluded Petitioner's trial counsel was not ineffective for failing to have a mental health expert evaluate Petitioner for a mental health defense, and further that there was no reasonable probability that Petitioner would have declined to plead guilty

and insist on going to trial if counsel had hired a mental health

expert. (Answer, Ex. 8, ECF No. 5-10 at 8T23:5-24:9.)

III. DISCUSSION

    A.   <u>Standard of Review</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a State court shall not be granted
> with respect to any claim that was adjudicated
> on the merits in State court proceedings
> unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts
> in light of the evidence presented in the
> State court proceeding.

"Contrary to clearly established Federal law" means the state

court applied a rule that contradicted the governing law set forth

in U.S. Supreme Court precedent or that the state court confronted

a set of facts that were materially indistinguishable from U.S.

Supreme Court precedent and arrived at a different result than the

Supreme Court. <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013)

(citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). The

phrase "clearly established Federal law" "refers to the holdings,

as opposed to the dicta" of the U.S. Supreme Court's decisions.

<u>Williams</u>, 529 U.S. at 412. An "unreasonable application" of clearly

established federal law is an "objectively unreasonable"
application of law, not merely an erroneous application. Eley, 712
F.3d at 846 (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)).

    B.    Analysis

        1.    Ground One

            a.    The Parties' Arguments

    In Petitioner's first ground for relief, he argues his counsel
was ineffective for failing to hire a mental health expert before
accepting a plea. (Pet., ECF No. 1 at 7.) Petitioner asserts there
was evidence of mental illness in his presentence report. (Id.)
Petitioner maintains that but for counsel's failure to hire a
mental health expert, he could have received a lighter sentence on
lesser charges or he could have used a diminished capacity defense.
(Id.)

    Respondents argue that the state courts correctly rejected
this ineffective assistance of counsel claim. (Answer, ECF No. 5
at 13-20.) Under New Jersey law:

            evidence that the defendant suffered from a
            mental disease or defect is admissible
            whenever it is relevant to prove that the
            defendant did not have a state of mind which
            is an element of the offense. In the absence
            of such evidence, it may be presumed that the
            defendant had no mental disease or defect
            which would negate a state of mind which is an
            element of the offense.

N.J.S. § 2C:4-2. (Answer, ECF No. 5 at 13.) A diminished capacity
defense is different from an insanity defense in that it is a

10

pinpointed attempt to negate the presence of an essential mental element of the crime. (Answer, ECF No. 5 at 14, citing State v. Rivera, 205 N.J. 472, 487 (2011)). The mental disease or defect must be identified and it must be one that is recognized by the medical community. (Id.) After a court determines that evidence of the defendant's condition is relevant and sufficiently accepted within the psychiatric community to be reliable for courtroom use, the determination that the condition constitutes a mental disease or defect is a question for the jury. (Id., citing State v. Galloway, 133 N.J. 631, 643 (1993)).

A person is guilty of aggravated manslaughter, under New Jersey law, if he/she "recklessly causes death under circumstances manifesting extreme indifference to human life." (Id.) (quoting N.J.S. § 2C:11-4(1)). The recklessness element is met if the person caused death "with an awareness and conscious disregard of the probability of death." (Answer, ECF No. 5 at 14, quoting State v. Wilder, 193 N.J. 398, 409 (2008)).

Respondents note that Dr. Bogacki opined Petitioner was likely suffering from a mental disease at the time he shot Hernandez, but he did not identify any mental disease. (Id., Ex. 29 at 6.) Additionally, Dr. Bogacki testified that Petitioner recalled that he was extremely reckless on the night of the shooting, and his recklessness caused him to unintentionally

discharge his gun. (Answer, ECF No. 5 at 15, citing Ex.7, 7T44:14-20.)

Respondents assert that Petitioner's admitted conduct of pointing a loaded gun at Hernandez's face, while standing a foot away from her, and cocking and uncocking the hammer of the gun demonstrated his conscious disregard for the probability that he would kill her if he fired the gun. (Answer, ECF No. 5 at 15.) His conduct also demonstrated an extreme indifference to Hernandez's life because there is a high probability that shooting someone in the face at point blank range will result in that person's death and cocking and uncocking the hammer of the gun created a significant risk that the gun would discharge. (Id.) In New Jersey, the focus on whether a defendant manifested extreme indifference to human life "is not on the defendant's state of mind, but on the circumstances under which the defendant acted." (Id., quoting State v. Wilder, 193 N.J. 398, 409 (2008)).

Respondents note Petitioner's trial counsel testified at the PCR remand hearing that, "[u]ltimately, it was my determination that the facts of the case as I anticipated would be introduced at a trial would negate very clearly any potential mental capacity defense, given his –- the behavior that he exhibited during, immediately after and going through the time line after the offense." (Answer, ECF No. 5 at 15-16, quoting PCR hearing transcript, May 2, 2013, 6T55:23-56:3.) Respondents assert Dr.

Bogacki's inability to provide evidence that Petitioner was unable to form the intent to commit aggravated manslaughter vindicated Petitioner's trial counsel's decision. (Answer, ECF No. 5 at 16.)

Mr. Mayer, Petitioner's trial counsel, testified that he sought to resolve the case prior to indictment to avoid the possibility that Petitioner would be charged with murder, which would expose him to a greater prison sentence. (Id.) Mr. Mayer was "very confident that the risks in trying to present a defense of diminished capacity and/or insanity, while likely being unsuccessful, would expose [Petitioner] to a tremendously longer state prison sentence." (Id., quoting PCR hearing transcript, May 2, 2013, 6T57:3-7.) Further, he testified "there would be enough facts to negate even relatively strong mental defense testimony from a doctor if a doctor was available." (Id.) Respondents submit that the state courts reasonably denied the remanded PCR ineffective assistance of counsel claim. (Id. at 16-20.)

### b. Ineffective Assistance of Counsel Standard of Review

There are two elements to a Sixth Amendment ineffective assistance of counsel claim, deficient performance by counsel and prejudice. Premo v. Moore, 562 U.S. 115, 121 (2011) (citing Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)). For the deficient performance prong, "a person challenging a conviction must show that counsel's representation fell below an objective standard of

reasonableness." Id. at 121 (internal quotations omitted) (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). A petitioner must overcome a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. (quoting Richter, 562 U.S. at 104) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)). The burden a petitioner must meet is "'that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" Id. at 122 (quoting Richter, 562 U.S. at 104) (quoting Strickland, 466 U.S. at 687)). Habeas review of counsel's performance is doubly deferential, and the question is not whether counsel's actions were reasonable but whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. Id. (citations omitted).

Strict adherence to the Strickland standard is essential "when reviewing the choices an attorney made at the plea bargain stage." Id. at 125.

> In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and

14

> perspective when the plea was negotiated,
> offered, and entered.

*Premo*, 562 U.S. at 126. To prove *Strickland* prejudice in the context of acceptance of a plea offer, a petitioner must "demonstrate 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 129 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

> [W]here a plea has been entered without a full
> trial or … even before the prosecution decided
> on the charges … added uncertainty … results
> when there is no extended, formal record and
> no actual history to show how the charges have
> played out at trial[, which] works against the
> party alleging inadequate assistance.
> Counsel, too, faced that uncertainty. There is
> a most substantial burden on the claimant to
> show ineffective assistance.

*Id.* at 132. Hindsight and second guesses in such a case are especially inappropriate. *Id.* "[I]f the defendant makes an insufficient showing on one [prong of the *Strickland* test]" a court need not address the other prong. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

### c. The State Court's Decision

Habeas review is of the highest state court's reasoned decision on the federal issue presented. *Blystone v. Horn*, 664

15

F.3d 397, 417 n. 15). The highest state court to address this issue is the Appellate Division's June 22, 2016 Opinion.

> On remand, defendant, his trial counsel and David Bogacki, Ph.D., testified at the hearing. Defendant described his mental health history as beginning at age nine or ten when he began to hear voices that would tell him to hurt himself or others. He was prescribed medication that caused the hallucinations to disappear. He was arrested several times as a juvenile, and while in detention regularly took his medication and "was fine." He continued to receive psychiatric care for several years but then stopped taking the medication at age twenty-one and the hallucinations returned.

> On the day he committed the offenses, defendant stated he only recalled the one event in which he pulled the trigger of a gun that killed a young woman. He said he was in a "trance" and described it as if he was "in a world outside of the norm…. It's like something's taking over me." He remembered a voice telling him to play with a gun and as he did so, it went off, shooting the victim. He recalled leaving the house, and calling a cab to go to his brother's home. He then went to his aunt's house in Washington D.C. where he was subsequently found and arrested.

> Defendant recalled telling his brother right after the shooting that he "got into some trouble" and telling a friend that he had just done "the worst thing you [can] do." He called another friend, telling her he needed "to get out of town because [he had done] something bad." Finally, defendant acknowledged that during his statement to the police he never told them he was in a trance or that a voice had told him to shoot the gun. As to conversations with his defense counsel, defendant testified that he told his attorney that he had mental health issues to which

counsel responded that his mental health would not be a defense.

Defense counsel, admitted to the bar for twenty-four years, stated he was privately retained by defendant, having represented him in several previous criminal matters. Counsel was aware of defendant's mental health history. After a consideration of whether to have defendant undergo a mental health evaluation, counsel advised against it. He explained that the facts which would have been presented at trial would have negated any potential mental capacity defense because of the behavior defendant "exhibited during, immediately after and going through the time line after the offense." He did not believe that diminished capacity or insanity were viable defenses.

Counsel further explained that there was an opportunity for defendant to resolve the matter with a lesser sentence and that he did raise the subject of defendant's mental health history in his conversations and negotiations with the prosecutor. He concluded: "I was very confident that the risks in trying to present a defense of diminished capacity and/or insanity, while likely being unsuccessful, would expose Mr. Bishop to a tremendously longer state prison sentence."

Bogacki conducted a psychological evaluation of defendant in 2012 and presented testimony of his findings at the hearing in July 2013. Although the doctor was aware of defendant's history of psychotic symptoms, the testing and evaluation did not reveal such symptoms and the doctor found his regime of medications to be stabilizing. He noted defendant had been previously diagnosed with a schizoaffective disorder and paranoid schizophrenia when hospitalized but that his incarceration had permitted him to take his medications regularly, thus stabilizing his condition.

Based upon defendant's long-term history of psychiatric problems, Bogacki concluded that at the time of the shooting defendant was suffering from a mental illness in the psychotic spectrum of disorders. The doctor agreed that defendant's behavior following the shooting was indicative of someone who was aware that their actions were wrong. Bogacki acknowledged that in the nine hundred pages of medical records he reviewed, there were no statements made by defendant that a voice had told him to shoot the victim. In fact, at all times defendant claimed the shooting had been an accident.

In a comprehensive oral decision delivered on January 2, 2014, Judge Kyran Connor found trial counsel to be "an experienced practitioner of criminal law who had handled mental health-related defenses over the course of 20 years of practice. I find he was a man with the experience to know when an insanity or diminished capacity defense would play well before a jury." Judge Connor noted the "infirmities" relating to defendant's mental health defense.

> "[T]here is no diagnosis or opinion that squarely holds that Mr. Bishop at the time of this crime labored under such a defect or reason from a disease of the mind that he did not know the nature and quality of his action or that if he did know it, he did not know that what he was doing was wrong.

The judge commented that in his review of the voluminous medical information, never had defendant said that he was in a trance or responding to a voice when he shot the victim. He always referred to the shooting as an accident.

In assessing the effectiveness of counsel under the two prongs set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct.

2052, 2064, 80 L. Ed. 2d 674, 693 (1984), the
judge found that trial counsel was a

> fully credible witness. I conclude
> that he exercised his best
> professional judgment in assessing
> Mr. Bishop's options in that he
> reasonably excluded a mental health
> defense as a viable option based on
> all the factors to which I've
> already averted, but most
> especially based on defendant's
> confessions and his clear
> demonstrations of a consciousness
> of guilt.

Because of his findings on the first prong, it
was not necessary for the judge to reach the
second prong but he addressed it nevertheless,
finding that defendant received a favorable
plea offer and counsel's use of the mental
health history was a factor in obtaining the
offer from the prosecutor. He rejected
defendant's argument that he was prejudiced by
counsel's failure to obtain a mental health
evaluation.

On appeal defendant argues:

> PCR court erred in denying the
> petition because trial counsel's
> failure to retain a mental health
> expert before negotiating a plea
> eliminated the maximum effective
> use of Bishop's mental health
> defenses.

We are not persuaded by this argument. The
standard for determining whether counsel's
performance was ineffective for purposes of
the Sixth Amendment was formulated in
Strickland, supra, 466 U.S. 668, 104 S. Ct.
2052, 80 L. Ed. 2d 674, and adopted by our
Supreme Court in State v. Fritz, 105 N.J. 42
(1987). In order to prevail on a claim of
ineffective assistance of counsel, defendant
must meet the two-prong test of establishing

both that: (1) counsel's performance was deficient and he or she made errors that were so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to the United States Constitution; and (2) the defect in performance prejudiced defendant's rights to a fair trial such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, supra, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068, 80 L. Ed. 2d at 693, 698.

We are satisfied from our review of the record that defendant failed to meet his burden of proof as to a showing of ineffectiveness of trial counsel within the Strickland-Fritz test. Trial counsel assessed whether defendant's mental health history could be a viable defense to the charges and concluded that insanity and diminished capacity would not be supported by the admissible facts. Defendant's actions after the shooting demonstrated that he was aware and understood that what he had just done was wrong. Furthermore, in the extensive discussions with mental health professionals in the years following this incident, not once had defendant offered that he was in a trance at the time of the shooting or being directed by voices; he had always described it as an accident. We find that Judge Connor's conclusion that trial counsel's "representation was well within the range of adequacy, which the Sixth Amendment guarantees," was supported by the credible evidence in the record.

(Answer, Ex. 26, ECF No. 5-28 at 2-8.)

       d.   <u>Ground One of the Petition is Without Merit</u>

The Appellate Division applied the correct standard under <u>Strickland</u> in denying Petitioner's ineffective assistance of

counsel claim. The Appellate Division also reasonably applied the Strickland standard in holding that defense counsel provided adequate representation in compliance with the Sixth Amendment because counsel exercised his professional judgment that an insanity or diminished capacity defense was unlikely to succeed.

Counsel's opinion was supported by Petitioner's behavior of immediately admitting wrongdoing to his brother and friends after shooting the victim, and his conduct of leaving town to stay with a family member in Washington D.C. The lack of any evidence that Petitioner told law enforcement or any mental healthcare providers that he was in a trance or responding to voices in his head at the time he shot the victim is compelling evidence in support of the Appellate Division's conclusion that counsel was not ineffective for failing to hire a mental health expert to evaluate Petitioner for a mental health defense. Ground One of the petition is denied.

2. <u>Ground Two is Unexhausted</u>

In Ground Two of the petition, Petitioner asserts the following:

> Aggravating and mitigating factors were not properly weighed in sentencing phase, which gave defendant an excessive sentence. The factual basis of the plea in itself does not reflect the conduct required for aggravated manslaughter.

> The sentencing discretion range is clearly barred, not the illegality finding mitigating factors.

(Pet., ECF No. 1 at 18.)

Petitioner did not describe how these alleged errors violated federal law. State law errors are not cognizable in federal habeas petitions. Swarthout v. Cooke, 562 U.S. 216, 219 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law") (internal quotations omitted)). The Court liberally construes Ground Two as raising two federal claims: (Ground 2a) Petitioner's plea to aggravated manslaughter was involuntary, in violation of the Due Process Clause of the Fourteenth Amendment, because the plea colloquy does not establish the elements of the crime; and (Ground 2b) Petitioner's sentence was excessive in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.

Upon review of the state court record, Petitioner did not fairly present the federal nature of these claims in the state courts. (Answer, Exs. 4, 15, 18, 22, 27, 31, 33, 35, 39, 4, ECF Nos. 5-6, 5-17, 5-20, 5-24, 5-29, 5-33, 5-35, 5-37, 5-41, 5-43.) Grounds 2(a) and 2(b), therefore, are unexhausted. A federal habeas court may dismiss unexhausted claims on the merits, if appropriate. 28 U.S.C. § 2254(b)(2); see McLaughlin v. Shannon, 454 F. App'x 83, 86 (3d Cir. 2011) (when a petitioner presents a mixed petition, a district court may deny meritless unexhausted claims under § 2254(b)(2) rather than dismissing the mixed petition without prejudice or permitting the petitioner to delete the

unexhausted claims). For the reasons discussed below, the Court denies the federal claims in Ground Two on the merits.

a. <u>Ground 2(a) is without merit</u>

In <u>McCarthy v. U.S.</u>, the Supreme Court described the constitutional rights implicated by a guilty plea.

> A defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For this waiver to be valid under the Due Process Clause, it must be an intentional relinquishment or abandonment of a known right or privilege. Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.
>
> Thus, in addition to directing the judge to inquire into the defendant's understanding of the nature of the charge and the consequences of his plea, Rule 11 also requires the judge to satisfy himself that there is a factual basis for the plea. The judge must determine that the conduct which the defendant admits constitutes the offense charged in the indictment or information or an offense included therein to which the defendant has pleaded guilty. Requiring this examination of the relation between the law and the acts the defendant admits having committed is designed to protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.

23

394 U.S. 459, 466-67 (1969) (internal quotations, citations and footnotes omitted).

The trial court engaged in the following plea colloquy with respect to Petitioner's guilty plea to aggravated manslaughter.

> THE COURT:  Okay, now this charge is for aggravated manslaughter, and it alleges that you caused her death recklessly under circumstances manifesting extreme indifference to human life.  Would you tell me what it was that you did which now causes [] you [to] plead guilty to aggravated manslaughter?
>
> MR. MAYER:  Judge, if I may? If there is no objection from the prosecutor or from, your Honor, if I may?
>
> THE COURT:  Go right ahead, Mr. Mayer.
>
> MR. MAYER:  Mr. Bishop, on that evening in Atlantic City when you were together with Ms. Hernandez, were you in possession of a handgun?
>
> MR. BISHOP:  Yes.
>
> MR MAYER:  And did you know that gun was loaded?
>
> MR. BISHOP:  Yes.
>
> MR MAYER: And was that a revolver?
>
> MR. BISHOP:  Yes.
>
> MR. MAYER:  And while in her presence did you have that handgun positioned in such away [sic] as it was pointed at her face or at her head?
>
> MR. BISHOP:  Yes.

MR. MAYER:   While you knew the gun to be loaded?

MR. BISHOP:  Yes.

MR. MAYER:  And were you working the action of that revolver with the hammer by pulling your thumb back and forth allowing the hammer to go back and then close on two or more occasions?

MR. BISHOP:  Yes.

MR. MAYER:  Were you aware that if you did not catch the hammer at the appropriate time while the gun was pointed at her head and if the gun fired, that there was a real likelihood that she may be killed as a result of the gun going off?

MR BISHOP: Yes.

THE COURT:   What distance were you from her when this occurred?

MR BISHOP: About the same distance as me and Mr. Mayer are.

THE COURT:   Which is only about a foot apart, is that correct?

MR BISHOP:  Yes.

THE COURT:   And the gun was actually pointed at her face or head?

MR BISHOP:  Yes.

THE COURT:   Now, you understand that in order to commit an aggravated manslaughter it has to be done recklessly under circumstances manifesting extreme indifference to the value of human life. Do you admit that by the handling of this known loaded weapon at that distance with the weapon directly pointed at her face that that was reckless conduct.

MR BISHOP:  Yes.

> THE COURT: In other words, conduct in wanton and willful disregard of her rights and safety?
>
> MR BISHOP: Yes, sir.
>
> THE COURT: And do you agree that it was handled -- the way the gun was handled and pointed it was done so under circumstances manifesting extreme indifference to her life by you?
>
> MR BISHOP: Yes, sir.
>
> THE COURT: And do you admit that that resulted -- that conduct under the totality of those circumstances resulted in a probability of death occurring to her life not just a mere possibility of death?
>
> MR. BISHOP: Yes, sir.

(Answer, Ex. 2, ECF No. 5-4 at 2T15-17.)

Under New Jersey law, "[a]ggravated manslaughter requires the State to prove that 'the defendant was *aware of and consciously disregarded* a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life.'" <u>State v. Jenkins</u>, 840 A.2d 242, 251 (N.J. 2004) (emphasis added in <u>Jenkins</u>) (quoting <u>State v. Cruz</u>, 749 A.3d 832 (2000)). The conduct of pointing a loaded revolver at a person's face from only one foot away while cocking and uncocking the hammer undoubtedly displays a conscious disregard that created a substantial risk of death, and that by consciously engaging in this conduct, Petitioner manifested an extreme indifference to

human life. Petitioner's Due Process claim based on his assertion that the factual basis of the plea did not support his conviction is without merit. The Court denies Ground 2(a) of the petition.

b.    Ground 2(b) is without merit

The Court construes Plaintiff's claim that his sentence is excessive as alleging a violation of the Eighth Amendment. "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.'" Miller v. Alabama, 567 U.S. 460, 469 (2012) (quoting Roper v. Simmons, 543 U.S. 551, 560 (2005)). The right stems from the concept that punishment for crime should be proportionate to the offense and the offender. Id.

In a challenge to the length of a sentence, courts consider all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive. Graham v. Fla., 560 U.S. 48, 59 (2010) as modified (July 6, 2010). In "determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime[][, a] court must begin by comparing the gravity of the offense and the severity of the sentence. Id. (quoting Harmelin v. Michigan, 501 U.S. 957, 1005 (1991) (opinion of KENNEDY, J.)).

> [I]n the rare case in which [this] threshold
> comparison ... leads to an inference of gross
> disproportionality" the court should then
> compare the defendant's sentence with the
> sentences received by other offenders in the

> same jurisdiction and with the sentences
> imposed for the same crime in other
> jurisdictions. [*Harmelin*, 501 U.S. at 1005.]
> If this comparative analysis "validate[s] an
> initial judgment that [the] sentence is
> grossly disproportionate," the sentence is
> cruel and unusual.

*Graham*, 560 U.S. at 60. "If the defendant fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge is at an end." <u>United States v. Burnett</u>, 773 F.3d 122, 137 (3d Cir. 2014).

Here, Petitioner was sentenced to a 24-year-term of imprisonment for aggravated manslaughter. Petitioner's extremely reckless conduct took another person's life. Petitioner was 21-years-old when sentenced, therefore, he is not facing life in prison. (Answer, Ex. 3, ECF No. 5-5 at 3T5.)

Moreover, "[t]he fact that the sentence fell within the advisory guideline range is in and of itself strongly suggestive of proportionality." <u>Id.</u> at 138. The sentencing transcript reveals that Petitioner was facing up to thirty (30) years with a mandate to serve 85 percent without parole eligibility on the aggravated manslaughter charge. (Answer, Ex. 3, ECF No. 5-5 at 3T5:10-15.) When Petitioner attempted to withdraw his guilty plea, the trial court advised that, based on Petitioner's extensive criminal history, and the fact that he shot a person in the face and killed her, he would have been sentenced in the upper range. (<u>Id.</u> at 3T5:17-7-11.) This Court concludes the severity of the sentence is

not grossly disproportionate to the gravity of the crime. <u>See</u> <u>Burnett</u>, 773 F.3d at 137 (24-year sentence for robbery where the victims were tied up and terrorized with a gun, and one victim was clubbed on the head when he tried to escape, was a reasonable and appropriate sentence). The Court denies Ground 2(b) of the petition.

        3.   <u>Ground Three</u>

For his third ground for relief, Petitioner asserts:

> It was brought to trial courts [sic] attention during PCR hearing that Due Process was violated at the very first process of defendant by arresting Officer's [sic] who clearly never read him his rights. This confession should have been vacated the plea should not have been accepted.

(Pet., ECF No. 1 at 19.)

In opposition to Ground Three, Respondents contend that the state courts correctly found that the police advised Petitioner of his <u>Miranda</u>[1] rights before speaking to him. (Answer, ECF No. 5 at 25.) In his initial PCR brief, Petitioner argued "Counsel failed to make efforts to have petitioner's statement suppressed." (Answer, Ex. 31, ECF No. 5-33 at p. i.) The PCR court stated, "[t]he recorded transcribed statements reveals [sic] that Mr. Bishop was advised of his <u>Miranda</u> rights and waived them, initialing each line on the card. Before he began questioning,

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Investigator Michael Mattioli asked if he had read the defendant his rights, the defendant understood them, if he was presented a card which he signed." (Id., Ex. 5, ECF No. 5-7 at 5T35:1-7.)

The PCR court therefore concluded that it was unlikely a judge would grant a motion to suppress the statements if the motion had been made, and counsel did not err for failing to make the motion. (Id., 5T35:12-36:1.) Respondents conclude Petitioner has not established that the court's ruling was based on an unreasonable determination of facts or was contrary to, or involved an unreasonable application of federal law. (Answer, ECF No. 5 at 26-27.)

This claim was raised as an ineffective assistance of counsel claim in the first PCR proceeding, therefore, the Strickland standard governs habeas review. In the habeas petition, the basis for Petitioner's claim that counsel erred by not bringing a motion to suppress his statements was that the police did not read him his Miranda rights. The PCR court found the police did read Petitioner his Miranda rights. The Appellate Division affirmed without discussion.

On habeas review, a state court's determination of facts is presumed correct and unless rebutted by the petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner has offered no evidence in support of his claim that the police did not read him his Miranda rights before taking his statement.

Therefore, there was no basis for counsel to make a motion to suppress the statement, and the PCR Court reasonably applied <u>Strickland</u> in denying the claim that counsel was ineffective. Ground Three of the petition is denied.

    4. <u>Ground Four</u>

  For his fourth ground for relief, Petitioner states, "Before being sentenced, defendant asked the court to retract his plea, but was denied by the court. Defendant had the right to change his mind and have a trial by jury." (Pet., ECF No. 1 at 20.) In opposition, Respondents note Petitioner did not exhaust this claim in the state courts, but argue it is without merit because New Jersey law does not permit a defendant to withdraw a negotiated plea simply because he changed his mind. (Answer, ECF No. 5 at 28.)

  Claims of state law error are not cognizable under § 2254. <u>Estelle</u>, 502 U.S. at 67. "There is no Federal or Constitutional right to withdraw a guilty plea." <u>Roten v. Deloy</u>, 575 F. Supp. 2d 597, 605 (D. Del. 2008) (citing <u>Hines v. Miller</u>, 318 F.3d 157, 162 (2d Cir. 2003)); <u>see</u> <u>Government of Virgin Islands v. Berry</u>, 631 F.2d 214, 219 (3d Cir. 1980) ("there is no absolute right to withdraw a guilty plea"). A plea of guilty is a waiver of trial resulting in a conclusive conviction and does not deny the defendant a right to a jury trial. <u>U.S. v. Colonna</u>, 142 F.2d 210, 213 (3d Cir. 1944). A defendant's contention that he did not know

he would be subjected to a severe sentence is not sufficient grounds for reversing the trial court's decision to deny defendant's motion to withdraw his guilty plea. <u>Colonna</u>, 142 F.2d at 213.

The trial court denied Petitioner's motion to withdraw his guilty plea because the only basis for the motion was Petitioner's belief that he might get a shorter sentence if he went to trial and argued the shooting was an accident. (Answer, Ex. 3, ECF No. 5-5 at 5T8:7-13:10.) No federal or constitutional right is implicated by this claim. Therefore, it is not cognizable in this habeas petition. Ground Four of the petition is denied.

IV.  CERTIFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

V.   CONCLUSION

In the accompanying Order filed herewith, the Petition for habeas relief under 28 U.S.C. § 2254 is denied.

Dated: August 31, 2018

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**